UNITED STATES, Appellee,

v.

George A. ROBERTS, Sergeant, U. S. Air Force, Appellant.

No. 30,818.
ACM S-24169.

U. S. Court of Military Appeals.

Oct. 8, 1976.

---

7. *Schlesinger v. Councilman*, 420 U.S. 738, 760–61 n. 34, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

8. *Id.* at 760, 95 S.Ct. at 1314.

*Major Bruce R. Houston* argued the cause for Appellant, Accused. With him on the brief was *Colonel Jerry E. Conner.*

*Captain Rex L. Fuller, III,* argued the cause for Appellee, United States. With him on the brief were *Colonel Julius C. Ullerich, Jr., Colonel C. F. Bennett,* and *Captain Frederick P. Waite.*

## Opinion

PERRY, Judge:

The appellant was convicted by general court-martial of possession of 438 grams of marihuana,[1] in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and was sentenced to a bad-conduct discharge and confinement at hard labor for 4 months. The findings and sentence have been approved at all review levels below. The appellant complains to this Court that his conviction is fatally tainted by the improper admission into evidence at trial, over his objection, of marihuana seized during an unlawful search of his quarters. We agree.

Shortly after assuming command of the 449th Supply Squadron at Kincheloe Air Force Base, about 2 months before the incident in question, Lieutenant Colonel English was advised by his fuels branch[2] chief

that some 21 of the 60 men in that branch were "suspected" of being involved with drugs.[3] In fact, some time after that, two men from that branch were apprehended by the Office of Special Investigations (OSI) with drugs at their duty stations, the last of which occurred about a week prior to the incident of concern.

Sometime during the week of December 13, 1974, the commander decided to conduct a "shakedown inspection" of the squadron for the sole purpose of discovering marihuana.[4] It was decided to hold this search[5] on Saturday, December 14, at 4:30 a. m. The reason for selecting the early Saturday morning hour according to Colonel English was to insure as many airmen present as possible during the activity.[6]

At the designated predawn hour, Colonel English, his first sergeant, several senior noncommissioned officers, a security policeman, a qualified marihuana dog named Butch, and the dog's handler all gathered outside the barracks. Prior to the search party entering the building, a number of the noncommissioned officers were stationed outside to prevent marihuana from being discarded successfully out the windows during the activity inside. The remainder of the group then entered the barracks and the search began.

The procedure was simple. The first sergeant opened the barracks door with his

1. Two other charges, alleging the wrongful appropriation of a parka valued at $40.70, and the wrongful possession with intent to deceive of an instrument purporting to be a military identification card, in violation of Articles 121 and 134, respectively, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 934, were dismissed after arraignment.

2. The fuels branch handled volatile and explosive substances, such as aviation gas, and worked with heavy equipment around aircraft on the flightline.

3. Neither the basis of this suspicion, nor an indication of whose suspicion it was, is revealed in the record.

4. Colonel English stated that his reason for the "inspection" was to learn "first hand" the extent of the drug problem in his unit. Additionally, however, the circumstances surrounding the search, *infra*, indicate that Colonel English

intended to, and in fact did, prosecute all persons he found in possession of contraband drugs.

5. In its opinion in this case, the Air Force Court of Military Review found:

We are constrained to recognize that whatever it might have been denoted, this was a "search" rather than an "inspection" in the traditional military sense of the terms.

*United States v. Roberts,* 50 C.M.R. 699, 703 n. 4 (A.F.C.M.R.1975).

6. I do not share the assuredness expressed in the dissenting opinion that the unit commander in the military "has the power of a magistrate in the civilian community to authorize" searches. Whether such an officer, by the nature of his position and duties, can be the neutral and detached magistrate constitutionally mandated is not a subject before this Court in the instant case.

passkey, turned on the lights, and announced the beginning of the "inspection." The dog handler then entered with his dog who sniffed around for marihuana. If Butch did not alert, the door to the particular room was closed and the party moved on to the next room. If he did alert, as in the case of the appellant's room, the security policeman entered the room and advised all occupants of their *Miranda-Tempia*[7] rights. Also, a noncommissioned officer was stationed at the doorway to prevent any tampering with the marihuana.

At the appellant's room, the security policeman apparently detected the odor of marihuana when the door was opened. Once inside the room, Butch alerted on a cabinet, his handler opened the door thereto which already was about 3 inches ajar, and Butch seized a bag of marihuana. Thereafter, the OSI was called and told of the discovery, and an OSI agent obtained permission of the base commander for a search of the room. During this search, and after being advised of his rights, the appellant admitted ownership of the marihuana in question.

■ As both parties to this case argue, the Fourth Amendment does not prohibit all searches and seizures, but only those which are "unreasonable." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Kazmierczak*, 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967). It would be calming judicially to search and seizure law if a satisfactory pervasive definition of that adjective could be conjured, but the reality is that reasonableness cannot be stated in rigid and absolute terms. *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). An appraisal of reasonableness necessarily is a variable of the factors brought to bear in a given situation.

■ However, even with this degree of amorphism, certain conclusions may be stated with a comforting degree of confidence. The most obvious, of course, is that a search

founded upon requisite probable cause and properly authorized by a valid warrant, *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), when conducted within the scope of that warrant, *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), is reasonable. Contrariwise, general exploratory searches, with or without a warrant, are forbidden as unreasonable. *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *see Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It is my opinion that this case falls within the latter and that this is an instance of a dragnet-type of search operation which, even in its military context, is constitutionally intolerable.

The facts of the case at bar are similar to those presented to this Court in the recent case of *United States v. Thomas*, 1 M.J. 397 (1976). Normally, that decision would be dispositive of this case. However, both because the position assumed by the Government in *Thomas* was different than the theory urged by the Government here, and because each of the judges in the former case utilized the opportunity to express three quite divergent opinions addressing three separate features of the issue, *Thomas* is not as helpful as it might be. Neither is it inconsequential, for how each judge chose to approach that case and what each said in doing so bears on the instant appeal.

In the lead opinion, Judge Cook resolved the question of the legality of the search on the dual grounds of (1) the insufficiency of the information provided the commander to constitute probable cause and (2) the extent of the information either not conveyed or misrepresented to the commander which bore on the issue of probable cause. Two other elements of Judge Cook's opinion in

---

7. *Miranda v. Arizona*, 384 U.S. 436, 84 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v.*  *Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

*Thomas* are worth noting. First, he regarded " 'the initial walk-through of the barracks' " as a permissible walk-through of open spaces of a barracks involving no entry into any area in which the accused had a reasonable expectation of privacy.[8] Second, however, Judge Cook specifically declined to express his view as to the validity of the marihuana dog and its handler departing this common area of the barracks and entering the accused's cubicle zoned off by his furniture,[9] a matter directly in issue in this appeal.

Chief Judge Fletcher, in an opinion concurring in the result, seemingly would signal with approval a military commander looking virtually anywhere, anytime, for anything, as long as that looking were *"reasonable."*[10] At the same time, however, he recognized the need for an exclusionary rule to safeguard against inherent abuses of this command authority carrying into the military justice system and, therefore, opined that "the fruits of all such inspections may not be used either as evidence in a criminal or quasi-criminal proceeding or as a basis for establishing probable cause under the Fourth Amendment."[11]

Senior Judge Ferguson also concurred in the result by separate opinion. Therein, Judge Ferguson expressed his belief that the very use of the marihuana dog was itself a search, the legality of which must be measured by its reasonableness under the circumstances, rather than a means by which evidence may be obtained to support a subsequent conclusion of probable cause to authorize a search by man. Under facts which, in important respects, parallel those of the case now before this Court, Judge Ferguson concluded that the search by the marihuana dog was unreasonable, as no probable cause existed prior to its use, as none of the recognized exceptions to the probable cause requirement existed, and as the accused had a reasonable expectation of privacy in his wall locker in his barracks cubicle.[12]

■ As stated above, the Government has assumed a somewhat different position in the instant case than presented to the Court in *Thomas.* Initially, the Government contends that there was no intrusion at all into the appellant's reasonable expectation of privacy, as a serviceperson's barracks quarters traditionally have been subject to both announced and unannounced visits by commanders inspecting same. *See United States v. King,* 2 M.J. 4 (1976). This argument, whether the activity in question was a traditional military inspection or a search, we believe correctly was determined adversely to the Government by the Air Force Court of Military Review. *United States v. Roberts,* 50 C.M.R. 699, 703 n. 4 (A.F.C.M.R.1975); *see United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970); *United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965). It is more

---

8. *United States v. Thomas,* 1 M.J. 397, 399–400 (1976).

9. *Id.,* 1 M.J. at 401.

10. *Id.,* 1 M.J. at 403 (Fletcher, Chief Judge, concurring in the result). While Chief Judge Fletcher did include this caveat, he left that term wholly undefined in a text in which presently recognized meanings thereof would appear not to apply. Additionally, one wonders just how this "reasonable" warning would be enforced, since by virtue of his exclusionary rule the only inspections which would become involved in the administration of military justice are those inspections which not only are "reasonable" but also in the hierarchy of things have the added virtue of being in compliance with the Fourth Amendment.

11. *Id.,* 1 M.J. at 404–405 (Fletcher, Chief Judge, concurring in the result) (footnote omitted).

12. Chief Judge Fletcher's vote to reverse the conviction in *Thomas,* when evaluated by the yardstick of his standard, discussed *supra,* causes the conclusion that, while he would permit a marihuana dog to be used for its trained purpose under "reasonable" circumstances, he and Judge Ferguson are in agreement that the dog may not be used to obtain probable cause for a subsequent search. Rather, the fruits of such a looking may not be admitted as evidence in a criminal prosecution unless probable cause existed prior to the dog's employment.

than a coincidence that all three judges in *Thomas* treated a similar factual schematic as a search.

■ Counsel for the Government also argue that the intrusion may be sustained on the ground utilized by the intermediate appellate court: that it was a lawful "shakedown inspection."

The so-called "shakedown inspection" is not a new phenomenon to this Court. *E. g., United States v. Drew,* 15 U.S.C.M.A. 449, 35 C.M.R. 421 (1965); *United States v. Harman,* 12 U.S.C.M.A. 180, 30 C.M.R. 180 (1961); *United States v. Gebhart,* 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959). Apparently, the event is contemplated as a thorough search of a general area, such as a barracks or a group of buildings (as opposed to a particular living area or room) of all persons and things in that area (as opposed to a particular, suspected person) for specific fruits or evidence of a crime, based upon "probable cause" to believe that such material will be found somewhere in that general area. This Court is unable to discern the constitutional basis for such a fishing expedition, nor is one apparent in this Court's precedents which seem merely to accept such a procedure as one "which has long been recognized." *United States v. Harman, supra* at 183, 30 C.M.R. at 183.

In their effort to justify this operation constitutionally, Government counsel liken the "shakedown inspection" to an "administrative regulatory inspection." [13] Chief Judge Fletcher commented on this theory briefly in his separate opinion in *Thomas*: [14]

The Supreme Court has been careful to limit such *statutorily authorized* inspections to instances in which a *regulated* business impliedly consented to the intrusions thereby justifying the searches on a well-recognized exception to the usual probable cause and warrant requirements of the Fourth Amendment. *See Almeida Sanchez v. United States,* 413 U.S. 266, 270–72, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), *comparing United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), *and Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), *with See v. Seattle,* 387 U.S. 541 (1967), *and Camara v. Municipal Court* [387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)].

Aside from the fact that the Congress has not chosen to enact legislation permitting specific-object oriented regulatory inspections in the military and defining the permissible ambit of such intrusions, as it did in the instances discussed in the cases cited by the Chief Judge—a matter which we deem of no little import—we do not believe that the young American citizen who enters the nation's armed forces, whether by enlistment or by conscription, can truly be said to have "impliedly consented" to a search of his or her personal living quarters, lockers, and belongings for evidence of a crime in the same sense that a gun merchant or a liquor dealer impliedly consents to an inspection of his or her records and certain areas of the business establishment.[15] It may well be, as the United

---

13. Judge Cook apparently bottoms his opinion on acceptance of this theory, which he simply refers to by another label: " 'area code-enforcement inspection' ", citing *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Not only is such activity as involved in the appellant's case not specifically statutorily authorized, as it was in all the "administrative regulatory inspection" cases approved by the Supreme Court, *infra,* but the "code" enforced by the inspection in *Camara* was the San Francisco Housing Code—a *civil* building code—not a *criminal* statute which is the only "code" sought to be enforced by such searches in the military.

14. *United States v. Thomas, supra,* 1 M.J. at 404 (Chief Judge Fletcher, concurring in the result).

15. Discovery of drugs appears presently to be the most frequently recurring object of modern-day "shakedown inspections." While it may be said that ridding a unit of debilitating contraband drugs is a legitimate motive going to the fitness of that unit to perform its military mission, it must be recognized that the same exercise exposes soldiers to criminal prosecution. As Judge Duncan remarked in his dissenting opinion in *United States v. Unrue,* 22 U.S.C.M.A. 466, 473, 47 C.M.R. 556, 563 (1973):
    Granting emphasis on the first cannot lessen the reality of the second.

States Court of Appeals for the District of Columbia suggested in *Committee for G.I. Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 477 (1975), that the "soldier cannot reasonably expect the Army barracks to be a sanctuary like his civilian home," but military quarters have some aspects of a dwelling or a home and in those respects the military member may reasonably expect privacy protected by the Fourth Amendment.[16]

While the traditional military inspection which looks at the overall fitness of a unit to perform its military mission is a permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion which a serviceperson must expect in a military society—the "shakedown inspection" as earlier defined in search specifically of criminal goods or evidence is not such a permissible intrusion into a person's reasonable expectation of privacy, even in the military setting. We hold, therefore, that the opening of the door to the appellant's room by the first sergeant and the entry by the marihuana dog and his handler into the room in search of marihuana without probable cause to believe that the appellant was in possession of that contraband violated the appellant's right to be free from unrea-

sonable searches and seizures.[17] Fourth Amendment, United States Constitution.

The decision of the United States Air Force Court of Military Review is reversed. The charge is dismissed.

FLETCHER, Chief Judge (concurring in the result):

For the reasons set forth in my separate opinion in *United States v. Thomas*, 1 M.J. 397, 402 (1976), I concur in the result.

COOK, Judge (dissenting):

I disagree with the majority's conclusion that there is no constitutional support for what was done here. In my opinion the "shakedown inspection," as it has been applied by this Court in earlier cases, has the force of tradition and reason behind it. Adherence to its tenets fully justifies the action taken by the commander in this case, but even if all the Court's previous decisions are disregarded, I believe that the essential nature of the shakedown inspection is analogous to the sort of "area code-enforcement inspection" that has been explicitly approved by the Supreme Court for the *prevention*, as well as the abatement, of conditions dangerous to the community. *Camara*

---

Chief Judge Fletcher addressed this duality of purpose-result in his *Thomas* opinion:

> It has been suggested by Government counsel that the commander's utilization of a marihuana dog was primarily "to enhance the performance of [the commander's] military mission." Yet, the fact remains that a marihuana dog's distinguishing attribute is his nose with its ability to ferret out a substance, possession of which is criminally punishable under the Uniform Code.

1 M.J. at 404. The present case reflects the criminal ramifications of a "shakedown inspection" for drugs: evidence of marihuana was found in three rooms and in two common areas, and we are advised that every serviceperson identified therewith was prosecuted. The commander's intent to do this from the very beginning is evidenced by his invitation of a security policeman to be a member of the search party and by the procedure of calling the OSI when marihuana was discovered.

16. My judgment that the appellant possessed a reasonable expectation of privacy in his closed

room under the circumstances of this case distinguishes this search from that involved in *United States v. Solis*, 536 F.2d 880 (9th Cir. 1976), relied upon by Judge Cook. There, the court, using the " 'reasonable expectation of privacy' " test set out in *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), found that "[t]he dogs' intrusion such as it was into the air space open to the public in the vicinity of the trailer appears to us reasonably tolerable in our society" under the factual circumstances of that case. *United States v. Solis, supra* at 882.

17. *See* Senior Judge Ferguson's separate opinion in *United States v. Thomas, supra*, 1 M.J. at 405, in which he states that "the use of a dog, trained to feret out the presence of contraband drugs, for that purpose constitutes a 'search' within the definition of the Fourth Amendment protection," which, like all searches, must be measured by the standard of "reasonableness."

*v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).[1]

It is my conviction that, if informed that approximately half of the members of the unit were suspected of drug possession and two were very recently apprehended, while on duty, with prohibited substances in their possession, an ordinary prudent person considering the nature of the volatile and high explosive material and equipment routinely handled by the personnel of the unit would fear for the safety of the men and the quality of the performance of their mission. Confronted with this information, the unit commander, who has the power of a magistrate in the civilian community to authorize an area code-enforcement search, could, I believe, properly determine that a search of the area to ferret out the instruments of danger to his community was reasonable.

The general impact of drug abuse in the military community has been documented elsewhere. *See Committee for G.I. Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 477 (1975). In my judgment, all the reasons that led the Supreme Court to sustain the area code-enforcement inspection as a reasonable balance of "the need to search against the invasion which the search entails" are present in this case. *Camara v. Municipal Court, supra*, 387 U.S. at 537, 87 S.Ct. at 1735.

Superficially, the hour approved by the commander for the search appears to be unacceptable, but the time is not unusual for military activity. Aside from the hour, the conditions of the search were, in my opinion, as unintrusive as the circumstances allowed. Only the dog and his handler entered the nonpublic rooms of the barracks; and only when the dog's conduct evidenced the probable presence of marihuana were further steps taken to discover the contra-

band. Recently, I noted my opinion that utilization of a dog "trained to use his natural sense of smell to detect special odors does not transform otherwise lawful Government conduct into an illegal search." *United States v. Thomas*, 1 M.J. 397, 401 (1976). I am confirmed in that opinion by the decision of the United States Court of Appeals for the Ninth Circuit in *United States v. Solis*, 536 F.2d 880 (1976). There, as here, a trained dog was used to obtain evidence of the probable presence of marihuana to justify further intrusion into private areas.

For the foregoing reasons, I would affirm the decision of the Court of Military Review.

---

1. As to the criminal nature of an "area code-enforcement inspection" the Supreme Court noted:

> Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection, again without a warrant. Finally, as this case demonstrates, refusal to permit an inspection is itself a crime, punishable by fine or even by jail sentence.

> *Camara v. Municipal Court*, 387 U.S. 523, 531, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967) (footnotes omitted).